IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | EP-23-CR-985-DB |
| § | |
| JULIAN AVITIA § | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

On this day, the Court considered Defendant Julian Avitia's "[ ] Motion to Dismiss," filed on August 28, 2023. Motion ("Mot.") ECF No. 25.[1] Mr. Avitia moves to dismiss his indictment, which charges possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). *Id.* at 1. Mr. Avitia challenges the constitutionality of this statute, both on its face and as applied, under (1) the Second Amendment and (2) the Commerce Clause. *Id.* at 1—2. The Court rejects his challenge on both counts.

## BACKGROUND

On May 24, 2023, a grand jury indicted Mr. Avitia for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) ("§ 922(g)(1)"). ECF No. 1. Section 922(g)(1) prohibits any individual "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from possessing firearms. At the time of his arrest, Mr. Avitia had three prior felony convictions—conspiracy to transport aliens, manufacture and delivery of a controlled substance, and aggravated robbery—resulting in his disarmament under § 922(g)(1).[2]

---

1 "ECF No." refers to the Electronic Case Filing ("ECF") number for documents docketed in this matter. When a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.
2 *United States v. Avitia*, 19cr1555 (W.D.Tex. Sept. 1, 2021); *State of Texas v. Avitia*, 20160D03961(346 Dist. Ct., Jan. 6, 2017); *State of Texas v. Avitia*, 20080D01577 (346 Dist. Ct. May 29, 2008).

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(1), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." "The Court must decide every pretrial motion before trial unless it finds good cause to defer a ruling." FED. R. CRIM. P. 12(d). "If a question of law is involved, then consideration of the motion is generally proper." *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (citation omitted).

## ANALYSIS

### I. Second Amendment Challenge

In 2008, the Supreme Court held that the Second Amendment establishes an individual right to bear arms. *See District of Columbia v. Heller*, 554 U.S. 570 (2008). Post-*Heller*, courts of appeals adopted a two-step framework, combining "history with means end scrutiny," to analyze Second Amendment challenges. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2117 (2022); see also *Nat'l Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 194 (5th Cir. 2012).

In 2022, *Bruen* struck down this means-end test as "inconsistent with *Heller*'s historical approach," establishing a new framework. 142 S.Ct. at 2129. In the first step, courts assess whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129—2130. Courts of Appeals often break this step into two questions: (1) is the *individual* covered by the Second Amendment; if so, (2) is their *conduct* covered by the Second Amendment. *See United States v. Rahimi,* 61 F.4th 443, 451–454 (5th Cir. 2022). If the court finds that the plain text of the Second Amendment covers the individual's conduct, then it proceeds to *Bruen*'s second step, where the government must show that the regulation is "consistent with the Nation's

2

historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

### a. The Second Amendment's Plain Text Covers Mr. Avitia's Conduct.

#### i. The Second Amendment's Plain Text Covers Individuals with Felony Convictions.

Post-*Bruen*, defendants across the country brought challenges against 18 U.S.C. §922(g), which establishes various status-based restrictions on firearm possession. Recently confronted with one such challenge, the Fifth Circuit observed that lower courts "operating in good faith, are struggling at every stage of the *Bruen* inquiry." *Daniels*, 77 F.4th 337, 358 (5th Cir. 2023) (Higginson, J., concurring). Commencing with *Bruen*'s first step, courts have struggled to parse whether certain groups, such as felons, are excluded from the plain text of the Second Amendment. These divergent outcomes stem from conflicting language in *Heller*.

The Second Amendment states "a well-regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II (emphasis added). *Heller* holds that "the people," as the Second Amendment uses it, "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 554 U.S. at 580. Thus, there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581 (emphasis added). But, later in the opinion, the Court states that "the right secured by the Second Amendment is not unlimited," *id.* at 626, and "elevates above all other interests the right of *law-abiding, responsible* citizens to use arms . . ." *Id.* at 635 (emphasis added). The Court further clarified that nothing in its opinion should "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id. at* 626. In this way, *Heller* presents a conflict: whether "all Americans" enjoy Second Amendment rights, or certain groups, such as "felons and the mentally ill," are excluded from

3

Second Amendment protection. *Id.* at 581, 626.

Post-*Heller*, Courts have taken one of two approaches to address this conflict. *See Kanter*, 919 F.3d 437, 451–453 (7th Cir. 2019). Under the first approach, courts "maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope." *Id.* at 451. Under the second approach, courts "maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right." *Id.* at 452 (citation omitted). Where the first approach "uses history and tradition to identify the scope of the right," the second "uses the same body of evidence to identify the scope of the legislature's power to take it away." *Id.* at 452. Dissenting in *Kanter*, then-Judge Barrett concluded that the second approach "is the better way to approach the problem." *Id.*

In two §922(g) challenges, *United States v. Rahimi* and *United States v. Daniels*, the Fifth Circuit endorsed Judge Barrett's interpretation that, at *Bruen*'s first step, "all people have the right to keep and bear arms." *Kanter*, 919 F.3d at 452; *see Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023) (holding that *Heller* and *Bruen* "espouse" Barrett's interpretation of the scope of the Second Amendment); *Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) ("[A]s a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms, *not because ordinary citizens are categorically excluded from the privilege.*") (emphasis added).

Neither Rahimi nor Daniels had a felony conviction, so the Fifth Circuit did not resolve whether individuals with felony convictions are included within the scope of the Second Amendment. *See Rahimi*, 61 F.4th at 452 (holding that because Rahimi "was not a convicted felon or otherwise subject to another longstanding prohibition on the possession of

4

firearms the strong presumption that he remained among the people protected by the amendment holds (cleaned up)); *Daniels*, 77 F.4th at 343 ("Because Daniels is not a felon or mentally ill, *Rahimi*'s treatment of the 'law-abiding' moniker suggests that he has presumptive Second Amendment rights as well."). Because neither *Rahimi* nor *Daniels* resolved whether individuals with felony convictions are included within the Second Amendment, the Fifth Circuit's endorsements of Barrett's dissent is dicta. Nevertheless, this Court finds these dicta persuasive, given that the Fifth Circuit has not yet resolved whether §922(g)(1) is constitutional and it has endorsed the *Kanter* dissent with each substantive opinion on a §922(g) challenge.

Heeding the Fifth Circuit's dicta in *Rahimi* and *Daniels*, the Court holds that individuals with felony convictions, such as Mr. Avitia, are included among "the people" entitled to Second Amendment rights. *Heller*, 554 U.S. at 580. The Court draws support from the Third Circuit as well as other district courts in the Fifth Circuit that have reached this same conclusion. *Range v. Att'y General of the United States of America*, 69 F.4th 96, 103 (3d Cir. 2023) ("we reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment."); *see also United States v. Melendrez-Machado*, No. 22-CR-634, 2023 WL 4003508, at *4 (W.D. Tex. Jun. 14, 2023); *United States v. Bullock*, No. 18-CR-165, 2023 WL 4232309, at *21 (S.D. Miss. Jun. 28, 2023).

### ii.    The Second Amendment Covers Possession of a Revolver.

Holding that Mr. Avitia is entitled to Second Amendment rights, the Court proceeds to evaluate whether his conduct is protected under the Second Amendment. The Court first examines whether Mr. Avitia's conduct is covered by the Second Amendment and next whether the firearm was "in common use at the time." *Heller*, 554 U.S. at 627 (2008). *Heller* did not define what it means for a firearm to be "in common use," but it clarified that the Second

5

Amendment does not protect "the carrying of dangerous and unusual weapons." *Id.* (citation omitted).

The Fifth Circuit held that Rahimi's conduct, "possession of a pistol and a rifle" was covered by the Second Amendment. *Rahimi*, 61 F.4th at 454. The court reasoned that the Second Amendment "grants him the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.'" *Id.* (citing *Bruen*, 142 S. Ct. at 2134–2135). And the court found that these weapons were "'in common use' such that they fall within the scope of the amendment." *Id.* (citing *Bruen*, 142 S. Ct. at 2143).

Like Rahimi, Mr. Avitia's challenged conduct was possession of a firearm—here a revolver instead of a pistol and a rifle. Indictment ECF No. 1. But this Court finds no reason to believe that a revolver is more "dangerous and unusual" than the weapons that Rahimi possessed. *Heller*, 554 U.S. 627. The Court thus finds that Mr. Avitia's conduct, like Rahimi's, "easily falls within the purview of the Second Amendment." *Rahimi*, 61 F.4th at 454.

### iii. Conclusion

Because the Court finds that (1) individuals with felony convictions are included among "the people" covered by the Second Amendment and (2) the Second Amendment covers possession of a revolver, the Second Amendment's plain text covers Mr. Avitia's conduct.

### b. Section 922(g)(1) is Consistent with the Second Amendment's Text and Historical Understanding.

Next, the Court evaluates whether the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130. *Bruen* provides "two conceptual pathways" to answer this question. *Daniels*, 77 F.4th at 342. Where the modern regulation addresses "a general societal problem that has persisted since the 18th century," courts employ a "straightforward historical inquiry." *Bruen*, 142 S.Ct. at 2131. Under this inquiry, the

"lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Where the modern regulation addresses "unprecedented societal concerns or dramatic technological changes," however, courts apply a "more nuanced approach," which "will often involve reasoning by analogy." *Id.* at 2132. Under the nuanced approach, courts analyze whether the government has provided a historical analogue that is "relevantly similar" to the challenged regulation. *Id.*

Mr. Avitia argues that the Court should apply the first, "straightforward approach," claiming that §922(g)(1) does not address an unprecedented societal concern because "[f]elons have existed since long before the founding." Mot. 12, ECF No. 25. However, the societal issue that §922(g)(1) was enacted to address was not felony convictions but soaring gun violence.

Congress enacted § 922(g)(1), in its current form, to address a precipitous rise in gun ownership and gun violence during the 1960s.[3] In an effort to "curb lawlessness and violent crime" Congress enacted The Gun Control Act of 1968. *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023). This legislation amended the National Firearms Act of 1934, adding restrictions on firearm possession for "certain congressionally defined groups, including . . . convicted felons." Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud, 133, 149 (1975). Section 922(g)(1) responded to a *modern societal phenomenon* by "deny[ing] access to guns and ammunition to . . . special risk groups." *Id.* at 152. Accordingly, the Court applies *Bruen*'s "nuanced approach."

The Government offers two analogies to §922(g)(1): (1) laws authorizing capital

---

3 Between 1960 and 1968, the sale of handguns quadrupled from 600,000 a year to 2.4 million a year. Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud, 133, 148 (1975). The increase in gun ownership was accompanied by an increase in gun violence: between 1964 and 1968, gun homicide in the United States increased by 89% (with larger spikes in urban areas, such as Detroit, where between 1965 and 1968 the number of homicides more than doubled from 140 to 389, and the percent of homicides committed by guns nearly doubled from 39% to 72%). *Id.*

7

punishment and estate forfeiture and (2) laws disarming dangerous or untrustworthy people. Response ("Resp.") 17–26, ECF No. 28. The Court will analyze each in turn to determine whether they are "relevantly similar" to §922(g)(1). *Bruen*, 142 S.Ct. at 2132.

### i. Capital punishment and estate forfeiture are not relevantly similar to §922(g)(1).

First, the Government offers capital punishment and estate forfeiture as historical analogues to §922(g)(1) because both were "commonly authorized punishments" for felony convictions when the Second Amendment was ratified. Resp. 17, ECF No. 28. The Government emphasized that disarmament under §922(g)(1) "imposes a relatively slight burden" compared to either of these punishments. *Id.*

Mr. Avitia challenges both examples, emphasizing that "every historical law considered in Bruen was an explicit firearm regulation" but "[n]either capital punishment nor estate forfeiture is a *firearm* regulation, so they are not properly considered under *Bruen*." Reply 20, ECF No. 29. Mr. Avitia also draws the Court's attention to the Third Circuit's rejection of the comparisons between §922(g)(1) and capital punishment or estate forfeiture. *See Range*, 69 F.4th at 105.

The Court in *Range* dismissed the comparison between §922(g)(1) and capital punishment, holding that "[t]he greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.*; *see also Bullock*, 2023 WL 4232309, at *23.

Next, *Range* dismissed the comparison between §922(g)(1) and estate forfeiture, finding that the "founding-era laws often prescribed the forfeiture of the weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms

8

generally." 69 F.4th at 105. In this way, the court held that "government confiscation of the instruments of crime (or a convicted criminal's entire estate) differs from a status-based lifetime ban on firearm possession." *Id.* Another Court in this district also rejected estate forfeiture laws, finding that these laws did not serve as reliable historical analogues because "doctrines of forfeiture and attainder did not carry over to the United States in their strict English form. Indeed, the First Congress [ ] abolished forfeiture of estate as a punishment for felons." *Melendrez-Machado*, 2023 WL 4003508, at *6 (internal citations omitted).

The Court is convinced by these arguments that neither capital punishment nor estate forfeiture establish a historical tradition for §922(g)(1). Moreover, as Mr. Avitia indicated, neither punishment specifically involves firearm regulation, *see* Reply 18 ECF No. 29, and so neither explicitly "burden a law-abiding citizen's right to *armed self-defense."* *Bruen*, 142 S.Ct. at 2132—2133 (emphasis added). As a result, the Court finds that neither historical analogue is relevantly similar to §922(g)(1) and neither support the constitutionality of the statute.

  ii. **Historical laws disarming "disloyal" group *are* relevantly similar to §922(g)(1).**

Next, the Government proposes three types of regulations disarming "dangerous" or "untrustworthy" groups: (1) "going armed" laws, (2) "virtuous citizenry" laws, and (3) "loyalty laws" that disarmed individuals on the basis of religious or political ideology. *See* Resp. 20–26, ECF No. 28. The Court is persuaded by the third category of regulation, the "loyalty laws," finding that these support the historical tradition for §922(g)(1).

    a. **Going Armed Laws**

First, the Government compares §922(g)(1) to colonial laws known as "going armed" laws, which "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." Resp. 21, ECF No. 28. The Government highlights four states (Massachusetts, Virginia,

9

North Carolina, and New Hampshire) that adopted laws prohibiting "going armed" and "authorizing the arrest of those who did so." *Id.* Yet *Rahimi* foreclosed exactly this comparison, finding that all but New Hampshire later amended their "going armed" laws so that they no longer provided for the forfeiture of firearms. 61 F.4th at 458. And the Fifth Circuit held that "one outlier is not enough to show a tradition."[4] *Id.* (internal citations omitted). Thus, the Court finds that "going armed laws" do not support the constitutionality of §922(g)(1).

### b. Virtuous Citizenry Laws

The Government also compares §922(g)(1) to the concept that the government has authority to disarm "unvirtuous citizens." Resp. 24, ECF No. 28 (quoting *United States v. Yancey*, 621 F.3d 681, 684–685 (7th Cir. 2010) (per curiam)). Mr. Avitia argues that *Daniels* "foreclosed historical analysis at this level of abstraction and generality." Reply 29, ECF No. 29. The Court agrees.

*Daniels* held that "[t]o remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a general notion of 'dangerousness.'" 77 F.4th at 354. But the Government does not cite to a particular regulatory tradition that disarms individuals based on the concept of a "virtuous citizenry." Indeed, "while virtuousness may have informed the Founders' political philosophy, there is no legal or practical 'tradition of disarming persons based on virtue.'" *Melendrez-Machado*, 2023 WL 4003508, at *7 (quoting Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 275 (2020)). Because the Government does not provide a particular

---

4 *Bruen* did not define what constitutes a "tradition" for the purpose of this analysis, but the Court did express "doubt that *three* colonial regulations could suffice to show a tradition." *Bruen*, 142 S.Ct. at 2142.

regulatory tradition for disarming people based on the concept of a "virtuous citizenry," this example also fails to support the constitutionality of §922(g)(1).

### c. Loyalty Laws

Finally, the Government argues that loyalty laws that "targeted particular groups for public safety reasons," are sufficiently analogous to §922(g)(1). Resp. 22, ECF No. 28 (quoting *Nat'l Rifle Ass'n of Am., Inc.* 700 F.3d at 200). On this point, the Court agrees.

The Government highlights laws from the Revolutionary War that "confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." Resp. 22, ECF No. 28 (quoting *Nat'l Rifle Ass'n of Am., Inc,* 700 F.3d at 200.). And at least three states—Maryland, Virginia, and Pennsylvania—"confiscated firearms from their Catholic residents during the Seven Years' War . . . because the Protestant majorities in those colonies viewed Catholics as defying sovereign authority and communal values." *Range*, 53 F.4th 262, 277 (5th Cir. 2022). These laws were preceded by the English parliament "forbidding Catholics who refused to take an oath renouncing their faith from owning firearms, except as necessary for self-defense." *Range*, 53 F.4th at 275 (quoting "An Act for the Better Securing the Government by Disarming Papists and Reputed Papists," 1 W. & M., Sess. 1, ch. 15 (Eng. 1688).[5]

The Court finds that these "loyalty laws" are relevantly similar to §922(g)(1) in both how and why they restrict the right to bear arms. Unlike capital punishment or estate forfeiture, the loyalty laws specifically revoke the right to firearm possession. Moreover, the scope of this disarmament mirrors §922(g)(1) because the loyalty laws "fully disarmed certain

---

5 While such prohibitions would be unconstitutional today, they provide an analytical lens in that they "demonstrate legislatures had the power and discretion to use status as a basis for disarmament." *Range*, 53 F.4th 262, 276 n.18 (3d Cir. 2022).

11

groups . . . just as §922(g)(1) fully disarms felons." *Melendrez-Machado*, 2023 WL 4003508, at *8.

As for *why* these laws were enacted, lawmakers were "driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed." *Range,* 69 F.4th at 112. (Ambro, J., concurring). Likewise, the Gun Control Act of 1968 "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Jackson*, 69 F.4th at 504–505. Because "[m]ost felons have broken laws deemed to underpin society's orderly functioning . . . Section 922(g)(1) thus disarms them for the same reason we prohibited British loyalists from being armed." *Range,* 69 F.4th at 112. (Ambro, J., concurring); *see also Melendrez-Machado*, 2023 WL 4003508, at *8 (Where "'disloyal' groups flouted the rule of law, defying sovereign authority and communal values," [the disarmament of felons] "is most naturally justified by their failure to conform to the law.")

The Court finds that both how and why the loyalty laws were enacted is relevantly similar to §922(g)(1) and thus these historical regulations support the constitutionality of the statute. The Court also finds that this interpretation aligns with *Bruen's* insistence that the Second Amendment protects the right "law-abiding citizens to keep and bear arms" and that nothing in that opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 142 S.Ct. at 2162 (Kavanaugh, J., concurring); *see Jackson*, 69 F.4th at 503 (Finding that legislatures' "discretion to disqualify categories of people from possessing firearms" is "bolstered by the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms").

### d. The Court Rejects Mr. Avitia's As Applied and Facial Challenges.

Mr. Avitia brings both an as-applied challenge and a facial challenge against §922(g)(1). *See* Mot. 4–5, 24–26, ECF No. 25. "When a litigant brings both as-applied and facial challenges, we generally decide the as-applied challenge first because it is a narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

"Unlike a facial challenge, an as-applied challenge does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Binderup v. Att'y Gen.*, 836 F.3d 336, 345 (3d Cir. 2016) (citation omitted). Mr. Avitia claims that §922(g)(1) is unconstitutional as applied to him because the Government has not shown that "permanently disarming those with criminal records like his is consistent with the Nation's historical traditions." Mot. 24, ECF No. 25. To support his position, Mr. Avitia cites to *Range*, where the Third Circuit held that §922(g)(1) was unconstitutional as applied to the defendant because the Government "failed to meet its burden to show a historical tradition of disarming those like [the defendant]." *Id.* at 25; *see Range*, 69 F.4th at 106 ("Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, §922(g)(1) cannot constitutionally strip him of his Second Amendment rights.").

However, Mr. Avitia's case is distinct from *Range* by nature of the underlying felonies that triggered his §922(g)(1) charge. Where Range's offense (making a false statement to obtain food stamps) did not involve violence, Mr. Avitia was convicted of aggravated robbery, which necessarily involves violence or the threat of violence. *State of Texas v. Avitia*, 20080D01577 (346 Dist. Ct. May 29, 2008); Tex. penal code title 7 Sec. 29.03(a) (1994) (Aggravated robbery entails (1) serious bodily injury to another; (2) use or exhibit of a deadly

13

weapon; or (3) bodily injury or threat of bodily injury to the elderly or a disabled person).

Although the Third Circuit declined to decide whether violence was the "touchstone" for as-applied challenges, in his concurring opinion, Judge Ambro stated that Range's as-applied challenge succeeded because "[t]here is nothing that suggests he is a threat to society." *Range*, 69 F. 4th at 112 (Ambro, J, concurring).

The Court distinguishes Mr. Avitia's felony conviction from Range's because aggravated robbery, unlike a false statement on a public benefits application, involves a "threat to society." *Id.* Although the loyalty laws, "driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed," do not provide a historical tradition for disarming Range, they do provide so for Mr. Avitia. *Id.* at 111 (Ambro, J., concurring). The Court finds that the Government has met its burden to show a historical tradition of disarming individuals with felony convictions like Mr. Avitia's and therefore rejects Mr. Avitia's as-applied challenge.

Turning to Mr. Avitia's facial challenge, he must show that "no set of circumstances exists under which the [statute] would be valid." *United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020). Because Mr. Avitia has not established that §922(g)(1) is unconstitutional as applied to him, the Court finds that his facial challenge likewise fails.

## II. Fifth Circuit Precedent Bars Mr. Avitia's Commerce Clause Claims.

Along with his Second Amendment challenge, Mr. Avitia raises both a facial and as-applied challenge to §922(g)(1) under the Commerce Clause. Mr. Avitia asserts "§922(g)(1) must regulate activity that substantially affects interstate commerce . . .[b]ecause §922(g)(1) does not meet these requirements, it is unconstitutional." Mot. 28, ECF No. 25; *see generally United States v. Lopez*, 514 U.S. 549 (1995) (holding that the Gun-Free School Zones Act exceeded

Congress' authority under the Commerce Clause). Mr. Avitia acknowledges that Fifth Circuit precedent forecloses his facial challenge, thus he makes this argument solely to "preserve it for further review." Mot. 31, ECF No. 25; *see United States v. Alcantar*, 733 F.3d 143, 145–146 (5th Cir. 2013) ("[W]e have consistently upheld the constitutionality of § 922(g)(1), including after the Supreme Court's decisions concerning Congress's Commerce Clause authority in *United States v. Lopez*, 514 U.S. 549 (1995) . . .[a]ccordingly, we are bound by our prior precedents and conclude that this issue is foreclosed.").

Mr. Avitia next argues that §922(g)(1) violates the Commerce Clause as applied to him. He argues that the Government cannot show that his conduct "had a substantial effect on commerce . . . simply because the gun was made out of state and at some point crossed into Texas." Mot. 31, ECF No. 25. But the Fifth Circuit has already rejected an as-applied challenge to § 922(g)(1) based on these very facts. *United States v. Rawls*, 85 F.3d 240, 243 (5th Cir. 1996) (holding that §922(g)(1) is not unconstitutional as applied to the defendant because he possessed a revolver which "had to result from transport in interstate commerce," which is "sufficient to establish a past connection between the firearm and interstate commerce.").

Because the Court finds that Mr. Avitia's Commerce Clause claims, both facial and as applied, are foreclosed by Fifth Circuit precedent, it also rejects this challenge to §922(g)(1).

## CONCLUSION

Mr. Avitia has not sustained his challenge to §922(g)(1) under either the Second Amendment or the Commerce Clause. Thus, after due consideration, the Court is of the opinion that the following orders should enter:

**IT IS HEREBY ORDERED** that Defendant Julian Avitia's "[ ] Motion to

Dismiss," ECF No. 25, is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Julian Avitia's cause is rescheduled for a stipulated bench trial on January 17, 2024 at 11:30 a.m.

**SIGNED** this \_\_7th\_\_ day of **December 2023**.

_____
**THE HONORABLE DAVID BRIONES**
**SENIOR UNITED STATES DISTRICT JUDGE**